**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| **OAKLEA PHILLIPS; VONDA SILER;** *and* **B.L. LEWIS, III;** *Heirs at Law of B.L. Lewis* | **PLAINTIFFS** |
| V. | CAUSE NO. 3:12-CV-175-CWR-FKB |
| **MSM, INC.,** *d/b/a* **MERCURY COMMUNICATIONS COMPANY; MSO, INC.; DAVID BAILEY; E.B. MARTIN, JR.; JAMES A. MURRELL, III; WILLIAM M. MOUNGER, II; ROBERT G. MOUNGER; WIRT A. YERGER, III;** *and* **WILLIAM M. YANDELL, III** | **DEFENDANTS** |

## ORDER

Before the Court is the defendants' motion for summary judgment. Docket No. 65. Having reviewed the arguments, evidence, and applicable law, the motion will be granted in part and denied in part.

**I.      Factual and Procedural History**

B.L. Lewis and Mercury Communications Company entered into an employment contract in 1992. They soon parted ways. In 1993, Mercury filed a lawsuit in Arkansas state court seeking to enjoin Lewis from working for a competitor. It claimed there was a non-compete clause in their contract.

Lewis responded that the non-compete clause was a forgery. The United States Secret Service investigated in 1994 and agreed that the page on which the non-compete clause appeared was a forgery. Mercury's attorney was made aware of that conclusion in February 1995.

Four months later, Mercury was advancing a plan to send almost all of its cash to its

owners, form another corporation, and transfer its revenues to that corporation. It carried out that plan in 1996.

Specifically, Mercury sent almost all of its cash ($375,000 out of $405,000) to its owners and merged with a shell company named MSM, Inc., which had been formed exclusively for the "merger." (For simplicity[1], from here onward Mercury/MSM will be referred to as MSM, except where the timeline indicates that it must be Mercury.) MSM kept its liabilities and spun off its business contracts (assets with a monthly revenue stream) into a new company called MSO, Inc., which had the same owners as the former Mercury. Docket No. 71-17, at 23, 47. Despite the merger and name change, MSM continued to do business as Mercury. *Id.* at 50. As for MSO, it never did any business other than collect revenues from the contracts it received from MSM. *Id.* at 24, 36.

The plaintiffs allege that the parceling out of MSM's assets constituted a fraudulent conveyance designed to keep Lewis from getting any money, should he obtain a judgment against them in the ongoing litigation. The defendants claim that the transactions were a legitimate restructuring designed to respond to their own changing desires and evolving conditions in the wireless industry. That is the crux of this suit.

In any event, after years of litigation in the state and federal courts of Arkansas, Lewis *did* obtain a judgment against MSM for $37,500 in compensatory damages and $250,000 in punitive damages. The judgment was affirmed on appeal in 2003. *Lewis v. MSM, Inc.*, 63 F. App'x 972 (8th Cir. 2003) (unpublished).

By then, though, Lewis could not collect on the judgment. MSM had divested itself of all

---

[1] It actually is more complicated. Apparently, Mercury and MSM merged to form Mercury, MSM dissolved, and Mercury changed its name to MSM, which did business as Mercury. *See* Docket No. 71-17, at 15-17.

its assets. It admittedly never even attempted to satisfy the judgment. Docket No. 71-18, at 15. A company with $4.3 million in income in 1998 had wound down such that in 2001 it reported $7 in income. Docket No. 72, at 49, 95. Nor could Lewis collect from MSO: although it was originally named in Lewis's suit, MSO had been dismissed for lack of minimum contacts with Arkansas.[2]

B.L. Lewis died. His heirs renewed their judgment in the United States District Court for the Western District of Arkansas, Texarkana Division (Cause No. 4:10-CV-4044) in 2010 and registered it in this Court in 2011. *See Syler v. MSM, Inc.*, No. 3:11-MC-95-DPJ-FKB (S.D. Miss. Feb. 17, 2011). The plaintiffs initially filed this suit in Arkansas federal court, but after jurisdictional skirmishes had to refile here, which they did in March 2012. *See Phillips v. MSM, Inc.*, No. 09-CV-4056, 2010 WL 1141503 (W.D. Ark. Mar. 22, 2010).

The plaintiffs alleged two causes of action. Count One seeks a declaratory judgment that MSO and the individual defendants, who are the former directors and shareholders of MSM and MSO, breached their fiduciary duties by enacting a fraudulent conveyance and are jointly and severally liable for the judgment. Count Two claims that the defendants are liable to the plaintiffs for the fraudulent conduct of MSM, either directly or for failing to stop the fraud of MSM's employees, officers, and attorneys. At heart, the plaintiffs desire to pierce the corporate veil of MSM and MSO to reach the individual defendants' assets.

After motion practice, a hearing, and discovery, the defendants filed the present motion for summary judgment. They contend that the judgment against MSM cannot be enforced against

---

[2] The plaintiffs claim that MSO obtained dismissal via fraudulent representations to the court. They say they later discovered that for some period of time, MSO may have been managing contracts in Arkansas. *See* Docket Nos. 71-18, at 41-42 (deposition testimony that MSO may have had Arkansas business); 71-21 (showing that Mercury had Arkansas contracts as of March 1994, implying that these contracts may have been passed to MSO).

MSO or the individual defendants because the plaintiffs lack sufficient evidence to show a fraudulent conveyance, to show a continuing enterprise, or to pierce the corporate veil. They also argue that the plaintiffs' claims are time-barred because, among other things, the transactions in question were described in a Plan of Merger publicly filed with the Mississippi Secretary of State on June 27, 1996.

The plaintiffs respond that they first learned the specifics of the transactional fraud on March 25, 2009, during post-judgment depositions of William Mounger, II and E.B. Martin, Jr. Since this suit was filed on March 12, 2012, it is timely, they say.

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inferences in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of that party." *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citation omitted). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quotation marks and citation omitted).

A party seeking to avoid summary judgment must identify admissible evidence in the record showing a fact dispute. Fed. R. Civ. P. 56(c)(1); *see Tran Enterprises, LLC v. DHL Exp. (USA), Inc.*, 627 F.3d 1004, 1010 (5th Cir. 2010) ("With respect to an issue on which the nonmovant would bear the burden of proof at trial, if the movant for summary judgment correctly points to the absence of evidence supporting the nonmovant with respect to such an

issue, the nonmovant, in order to avoid an adverse summary judgment on that issue, must produce sufficient summary judgment evidence to sustain a finding in its favor on the issue.").

The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant. *Maddox v. Townsend and Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011). But the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *as revised on denial of reh'g*, 70 F.3d 26 (5th Cir. 1995).

Because this case is proceeding in diversity, the applicable substantive law is that of the forum state, Mississippi. *Capital City Ins. Co. v. Hurst*, 632 F.3d 898, 902 (5th Cir. 2011). State law is determined by looking to the decisions of the state's highest court. *St. Paul Fire and Marine Ins. Co. v. Convalescent Servs., Inc.*, 193 F.3d 340, 342 (5th Cir. 1999).

### III. Discussion

Two matters will be addressed up front.

First, MSM claims it was never served with a summons and complaint. Although one of the returned summons on the docket sheet suggests otherwise, *see* Docket No. 29, it is not necessary to consider its sufficiency as MSM has waived any defect in service or personal jurisdiction by failing to file a motion to dismiss on those grounds. *See* Fed. R. Civ. P. 12(h).

Second, to the extent the plaintiffs are attempting to hold the non-MSM defendants liable for MSM's breach of the employment contract or wrongful submission of a fake document to the Arkansas trial court, those claims are too late. Bringing them now would either violate the rule against claim-splitting, since these defendants should have been sued in the lawsuit alongside MSM, or would be time-barred by the three-year statute of limitations set forth in Mississippi

Code § 15-1-49 or Arkansas Code § 16-56-105.[3] This suit concerns only the defendants' alleged transactional malfeasance.

### A. Tort Claims: Fraud/Fraudulent Conveyance & Breach of Fiduciary Duty

#### 1. Substantive Law

"Neither law nor equity will permit one corporation to take all the property of another, deprive it of the means of paying its debts, enable it to dissolve its corporate existence, and place itself practically beyond the reach of creditors, without assuming its liabilities." *Meridian Light & Ry. Co. v. Catar*, 60 So. 657, 658 (Miss. 1912) (collecting authorities). It does not matter if the corporate transactions technically do not constitute a consolidation or a merger; the Mississippi Supreme Court has frowned upon a corporate "reincarnation" which, "by whatever name it may be called . . . stripped the old company of all of its property, left it without the means to pay its debts, absorbed its stocks, bonds, and franchises, and took up its residence in the house of the deceased." *Id.* That is especially so where "the stockholders and officers of the absorbed company actually aided and assisted in bringing about this result." *Id.*

Over the years, the Mississippi Supreme Court has repeatedly disapproved of corporate asset-stripping as a debt-avoidance measure. *See Morris v. Macione*, 546 So. 2d 969, 971 (Miss. 1989) ("A corporate obligor and those who control it may not with impugnity [sic] dissolve the corporation in a debt avoidance maneuver and cause its assets to be transferred to a new successor corporation. This is so whether the debt arises in contract, quasi-contract, or tort."); *Stanley v. Mississippi State Pilots of Gulfport, Inc.*, 951 So. 2d 535, 539 (Miss. 2006) (same).[4]

---

[3] At the March 2013 hearing, plaintiffs' counsel confirmed that they were not seeking to make such a claim, but it is worth clarifying in light of the ambiguity of the complaint.
[4] *See also Cooper v. Mississippi Land Co.*, 220 So. 2d 302, 304 (Miss. 1969) ("The directors of an insolvent corporation, who are also creditors thereof, have no right to grant themselves preferences or advantages in the

In these circumstances, the creditor's rights are "embedded in a nebulous web of law" which can be difficult to untangle. *Morris*, 546 So. 2d at 970. The "centerpiece" of that law is known as fraudulent conveyance. *Id.* "In the aggregate," it "empower[s] the judicial conscience that the debt may follow the assets and a remedy may be had against those who cause the transfer and their transferees who take with notice and give less than fair value." *Id.* at 971.

Creditors in these cases have recovered from corporations *and* individuals. In *Catar*, because the transactional scheme was found to be fraudulent, the creditor was allowed to bring her claim against the successor company. *Catar*, 60 So. at 658-59. In *Morris*, the creditor was permitted to hold his judgment against the dissolved corporation, the successor corporation, the successor corporation's shareholders, and any future successor. *Morris*, 546 So. 2d at 970-72. In *Stanley*, the creditor was permitted to maintain his judgment against the successor corporation and its directors.[5] *Stanley*, 951 So. 2d at 537. The defendant's liability is simply "limited to the extent [it] has acquired assets of [the original corporation] without paying fair value therefor." *Morris*, 546 So. 2d at 972.

Where the recipient of assets is a corporation and "it is unclear from the record whether the value of the transferred assets would equal the amount of the judgment, it is necessary to discuss the alternative doctrine of 'continuity of enterprise.'" *Stanley*, 951 So. 2d at 539. This asks the finder of fact to determine whether to hold the successor corporation liable after considering the following factors:

(1) whether only one corporation remains after the transfer of assets; (2) identity

---

payment of their claims over other creditors.") (voiding corporation's deed of land to directors).
[5] Corporate directors and officers "are liable jointly and severally for losses of the corporation caused by their bad faith or willful and intentional departures from duty, their fraudulent breaches of trust, their gross or willful negligence, or their ultra vires acts." *Knox Glass Bottle Co. v. Underwood*, 228 Miss. 699, 764, 89 So. 2d 799, 825 (1956) (collecting authorities).

7

>   of stock, shareholders, and directors between the two corporations; (3) retaining the same employees; (4) retaining the same supervisory personnel; (5) retaining the same business facilities in the same physical location; (6) offering the same services; (7) retaining the same name; (8) continuity of assets; (9) continuity of general business operations; and (10) whether the successor holds itself out as the continuation of the previous enterprise.

*Id.* at 540 (citation omitted). The continuity of enterprise doctrine deals "with cases that concern liability as it relates to debts owed by the predecessor when the successor takes on the identity of the predecessor company in every way except taking responsibility for the predecessor's debts." *Paradise Corp. v. Amerihost Dev., Inc.*, 848 So. 2d 177, 180-81 (Miss. 2003).[6]

### 2. Analysis

Applying the above cases and considering the evidence available at this stage, there is a fact dispute as to whether MSO and the individual directors may be liable for fraudulent conveyance. A reasonable fact-finder could wade through the circumstances of the "merger" and its aftermath and conclude that the transactions were a smokescreen designed to shield MSM's assets from Lewis, who by that time could foreseeably achieve a judgment against MSM, and also perhaps from law enforcement, which investigated the circumstances of the forged contract and could have sought criminal punishment or civil liability against MSM and the individual perpetrators. The proximity of the transactions to the Secret Service's disclosure to corporate counsel, the consistent ownership of the two companies, and the fact that MSM continued to do business as Mercury after the legal maneuvering all seem particularly salient. *See Morris*, 546 So. 2d at 970 ("Insofar as the public knew, the business continued as before.").

If the amount that was fraudulently conveyed ($375,000 plus the value of the contracts

---

[6] Case law suggests that the continuity of enterprise doctrine is a derivative claim like piercing the corporate veil. *See EDW Investments, LLC v. Barnett*, 149 So. 3d 489, 492 (Miss. 2014); *Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1175 (5th Cir. 1992).

8

sent to MSO) is less than Lewis's judgment (which has now earned more than a decade's worth of interest), the fact-finder could also determine whether MSO is a continuing enterprise of MSM. *Stanley*, 951 So. 2d at 539. The fact that two companies remained after the "merger" and spin-off is not controlling, *see Paradise*, 848 So. 2d at 180-81, and among the evidence of successive operations present here, an internal memorandum from MSO's president acknowledges that "the liability is still there" even though the judgment was against MSM, *see* Docket No. 71-15, at 2.

To this, the defendants argue that the transactions cannot constitute a fraudulent conveyance because they took place several years before Lewis received a judgment. The argument fails to persuade.

Under Mississippi law in effect at the time, "a conveyance is fraudulent if it results from fraud or with the 'intent or purpose to delay, hinder, or defraud creditors.'" *Carroll v. Carroll*, 78 So. 3d 332, 335 (Miss. App. 2010) (quoting Miss. Code Ann. § 15-3-3 (repealed 2006)). "When examining a conveyance to determine if it is fraudulent, a court searches for certain 'badges of fraud,' or suspicious circumstances, which usually accompany a fraudulent conveyance." *Se. Bank of Broward, Fla., N.A. v. I.P. Srullo Enter., Inc.*, 555 So. 2d 704, 707 (Miss. 1989) (citation omitted). Badges of fraud include "transfer in anticipation of litigation and amount of control over property by debtor after transfer." *Carroll*, 78 So. 3d at 336 (citation omitted).

A finder of fact could consider whether the defendants planned the fraudulent conveyance in anticipation of continued litigation with Lewis. By 1995, Mercury had been entangled in litigation against Lewis for years, used a fake document in court, and found out by the Secret Service. The writing was on the wall even if the specific consequences of those

9

activities were unknown. Though the defendants insist that the merger and spin-off were legitimate, the dispute of fact regarding whether the transactions constituted a fraudulent conveyance requires this Court to deny defendant's motion for summary judgment on this basis.

### 3.     Statute of Limitations

Despite the above, undisputed facts regarding when the plaintiffs learned of the alleged fraudulent conveyance indicate that their fraud-based claims are barred by the statute of limitations.

In Mississippi, fraud claims have a three-year statute of limitations. *Stephens v. Equitable Life Assur. Soc'y of U.S.*, 850 So. 2d 78, 82 (Miss. 2003). The same limitations period applies to fraudulent conveyance claims brought pursuant to Mississippi Code § 15-3-3,[7] the fraudulent conveyance statute in effect at the time of distribution of MSM's assets. *O'Neal v. Millette*, 797 So. 2d 869, 874-75 (Miss. 2001). If the fraud is concealed, the statute of limitations is tolled until "the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered." Miss. Code Ann. § 15-1-67.

Relying on § 15-1-67, the plaintiffs assert that their fraud-based claims did not accrue until the March 2009 depositions of MSM's owners. The defendants, however, argue that "the rule of concealed fraud cannot apply to matters of public record," *O'Neal*, 797 So. 2d at 875, and that the plaintiffs should have known of the transfer of assets by June 1996, when the Plan of Merger was filed with the Mississippi Secretary of State.

The public record rule states that "where the alleged fraudulent conveyance is recorded, the circumstances are public and the means of finding out the character of the transaction are

---

[7] Section 15-3-3 "has been replaced, effective July 1, 2006, by the Uniform Fraudulent Transfer Act, Miss. Code Ann. §§ 15-3-101 et seq. (Supp. 2006)." *Stanley*, 951 So. 2d at 538 n.2.

10

available." *Aultman v. Kelly*, 109 So. 2d 344, 347 (Miss. 1959). The Mississippi Supreme Court "has clearly held that where an alleged fraudulent conveyance of real property is recorded and available to the public, there can be no concealed fraud preventing the running of statute of limitations." *O'Neal*, 797 So. 2d at 876.

In *O'Neal*, a judgment creditor filed a fraudulent conveyance action against a judgment debtor more than four years after the debtor conveyed land to his son, as documented by a "duly filed and properly recorded" deed. *Id.* at 872, 875. The creditor argued that the three-year limitations period was tolled by concealed fraud. *Id.* at 875. The Mississippi Supreme Court declined to toll the statute of limitations because the creditor had not used reasonable diligence in discovering the conveyance. As a result, the statute of limitations began to run on the date that the deed was filed and recorded; the creditor's suit was one year too late.

Under *O'Neil*, the defendants' argument plainly has some merit. Despite its appeal, though, the undersigned hesitates to conclude that the filing of the Plan of Merger was sufficient to give the plaintiffs constructive knowledge of the depletion of MSM's assets. Unlike in *O'Neal*, where the public record was a deed that documented the transfer of real property, here the Plan of Merger did not document that a fraudulent conveyance had already occurred; rather, it merely disclosed a *plan* of future action, which could have, and ultimately did *change* in some regards. *See* Docket No. 65-7, at 5 ("The effective time of the Merger . . . shall be determined by the Board of Directors of MSM."). For example, the amount to be paid to Mercury's shareholders upon the merger changed from $72.97/share as of the date the Plan of Merger was filed to $97.30/share as of May 23, 1997, the date a Mutual Release Agreement was executed by William Mounger, II, who signed as president of both companies. *Compare id. with* Docket No.

71-20, at 18-20. While the Plan of Merger is relevant and may support the defendants' statute of limitations defense, it is not dispositive.

What is dispositive, however, is Lewis's December 15, 2000 federal lawsuit against MSM and MSO alleging breach of contract and fraud. Docket No. 65-3. On page one of that complaint, Lewis alleged that "[s]ome of the assets of Mercury Communications Company were transferred to MSO, Inc., . . . and the transfer made Mercury Communications Company incapable of paying its debts and this transfer was therefore *fraudulent* as to plaintiff." *Id.* at 1 (emphasis added). By that point, at the very least, Lewis should have asserted a fraudulent conveyance claim against the defendants.[8] The plaintiffs complain that MSO subsequently committed a fraud upon the court to secure dismissal for lack of personal jurisdiction, but upon dismissal Lewis could have immediately pursued his claims against MSO, including his fraudulent conveyance theory, in a Mississippi court.

Still, the plaintiffs say, the fraudulent scheme was so complex that they could not possibly have discovered it until the 2009 depositions at defense counsel's offices. Docket No. 71, at 32. At those depositions the plaintiffs received a number of corporate documents which had never before been produced, for example, as the deposition transcript suggests that defense counsel may not have searched his firm's offices for responsive material until that day.

Although the plaintiffs gleaned new information at the depositions, their argument misunderstands the discovery rule. The rule does not toll the statute of limitations until the plaintiff knows every detail of the fraudulent scheme which caused him harm. It merely "provides a tolling of the running of a statute of limitations until a plaintiff should have

---

[8] Even if Lewis did not know the identity of every individual defendant at that point, he had enough to know MSO's name and seek discovery into the identity of its owners.

reasonably known of some negligent conduct, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent." *Moore v. Mem'l Hosp. of Gulfport*, 825 So. 2d 658, 667 (Miss. 2002) (quotation marks and citation omitted). "Expressed another way, the operative time for the running of the statute of limitations is when the [plaintiff] can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the" defendant. *Id.* (quotation marks, citation, and brackets omitted). It is not necessary to have every detail of the manner in which the harm was caused.[9]

According to Lewis's 2000 complaint, he knew that MSM and MSO had made a fraudulent conveyance. He should have brought such a claim within three years.[10]

### B. Derivate Claims: Piercing the Corporate Veil

What remains is whether the plaintiffs can collect on their judgment against MSM by piercing its corporate veil to reach the assets of its owners.

#### 1. Statute of Limitations

As before, the defendants contend that this theory is time-barred. The argument is not persuasive.

---

[9] Although the Court has cited negligence cases in its explanation of the discovery rule, the rules operates similarly in fraud cases. *See, e.g.*, *Turner v. Wakefield*, 481 So. 2d 846, 848 (Miss. 1985).

[10] While the statute of limitations has run on the plaintiffs' fraud-based claims, the continuity of enterprise theory does not resolve in an identical fashion. For one, case law already cited suggests that continuity of enterprise is a derivative claim which perhaps should be treated like other derivative claims for statute of limitations purposes. *See* Part III.B.1, *infra*. Further, on the merits, the summary judgment evidence is weak as to when the plaintiffs reasonably should have known that MSO was a mere continuation of MSM. If those facts were first gleaned from the 2009 depositions, this claim is likely timely. The Court will hear the evidence.

The Court will also take argument on whether it is necessary to reach the continuity of enterprise given the amounts in question. *See* Part III.A.1, *supra*; *Stanley*, 951 So. 2d at 539.

> In the Fifth Circuit,
>
> when a money judgment (1) is rendered in a federal district court located in one state, and (2) is duly registered in a district court located in another state, (3) at a time when enforcement of that judgment is not time-barred in either state, the applicable limitation law for purposes of enforcement of the registered judgment in the registration district is that of the registration state . . . *and* it starts to run *on the date of registration*.

*Home Port Rentals, Inc. v. Int'l Yachting Group, Inc.*, 252 F.3d 399, 407 (5th Cir. 2001).

"[R]egistering a judgment under [28 U.S.C. §] 1963 is the functional equivalent of obtaining a new judgment of the registration court." *Del Prado v. B.N. Dev. Co.*, 602 F.3d 660, 666-67 (5th Cir. 2010) (quotation marks and citation omitted).

Mississippi Code § 15-1-45 sets forth the statute of limitations for actions founded on foreign judgments. It reads:

> All actions founded on any judgment or decree rendered by any court of record without this state shall be brought within seven years after the rendition of such judgment or decree, and not after. However, if the person against whom such judgment or decree was or shall be rendered, was, or shall be at the time of the institution of the action, a resident of this state, such action, founded on such judgment or decree, shall be commenced within three years next after the rendition thereof, and not after.

Miss. Code Ann. § 15-1-45.

Lewis first obtained a judgment against MSM in the United States District Court for the Western District of Arkansas on May 2, 2002. Under Arkansas law, he could obtain a new judgment by bringing an action on the original judgment within 10 years. *See Agribank, FCB v. Holland*, 27 S.W.3d 462, 463 (Ark. App. 2000) ("the judgment creditor can start the limitation period anew by bringing an action on the judgment and obtaining a new judgment"). The plaintiffs, as Lewis's heirs, used this law in 2010 to obtain a new judgment. *See Syler v. MSM, Inc.*, No. 4:10-CV-4044-HFB, 2010 WL 3715144 (W.D. Ark. Sept. 13, 2010) (granting the

14

plaintiffs a judgment of $350,422.08 against MSM "in renewal of and in substitution for the Judgment previously granted in favor of B.L. Lewis"). That was timely.

Under Mississippi Code § 15-1-45, the plaintiffs then had three years to register their renewed judgment and file suit in Mississippi. They enrolled their judgment in this Court on February 17, 2011 and filed suit on March 12, 2012. These actions also were timely. *Accord Smith v. RJH of Fla., Inc.*, 520 F. Supp. 2d 838, 840-43 (S.D. Miss. 2007); *Mabie v. Shannon*, 120 So. 3d 415 (Miss. App. 2012) (holding that the 2005 renewal of a Florida judgment constituted a new judgment under Florida law, such that the 2006 enrollment of the judgment in Mississippi was timely under § 15-1-45).

The non-MSM defendants then claim that the judgment cannot be enforced against them because it was only against MSM. *See* Docket No. 66, at 11. In 2012, however, the Mississippi Court of Appeals held that a judgment creditor attempting to pierce the corporate veil can sue individuals and entities who were not parties to the original judgment. It reasoned as follows:

> In almost all the corporate veil-piecing cases in Mississippi, the plaintiff brought the underlying contract or tort claim in the same action as the veil-piercing claim. But Mississippi law has not required a plaintiff to do so. Thus, we hold: (1) a second suit is permissible; (2) once an underlying judgment is obtained against the corporation or LLC, the judgment debtor corporation or LLC does not have to be named in the second suit; and (3) the statute of limitations for the second suit begins to run from the date the judgment is rendered in the first suit.[11]

*Restaurant of Hattiesburg, LLC v. Hotel & Restaurant Supply, Inc.*, 84 So. 3d 32, 44 (Miss. App. 2012) (citations omitted). Such a claim "was not a direct action . . . but instead a derivative action based on the judgment." *Id.* at 46.

Given the above authorities, the plaintiffs' attempt to pierce the veil is timely and

---

[11] The third element does not foreclose the plaintiffs' claim because the renewed judgment is treated as a new judgment.

15

properly brought against the defendants. The Court will now turn to the merits.

### 2. Substantive Law

The Mississippi Supreme Court applies a three-part test for piercing the corporate veil:

> In both tort and contract claims, the corporate entity will not be disregarded unless the complaining party can demonstrate: (1) some frustration of expectations regarding the party to whom he looked for performance; (2) the flagrant disregard of corporate formalities by the defendant corporation and its principals; and (3) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder.

*Canadian Nat. Ry. Co. v. Waltman*, 94 So. 3d 1111, 1115 (Miss. 2012).

Mississippi courts "do not take piercing of the corporate veil lightly because of the chilling effect it has on corporate risk-taking." *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969, 978 (Miss. 2007) (quotation marks and citation omitted). "[T]he concept of the corporation is that the distinct corporate entities will be maintained *unless* to do so would subvert the ends of justice." *Id.* at 977 (quotations marks and citation omitted); *see also Highway Dev. Co. v. Mississippi State Highway Comm'n*, 343 So. 2d 477, 480 (Miss. 1977) ("we will not rigidly maintain the distinct corporate identity where, as would be the case here, to do so would subvert the ends of justice").

Disregard for corporate formalities is typically shown by evidence that the defendant failed to conduct regular board meetings, appoint officers and directors, maintain corporate minutes, or keep financial records, among other things. *See Buchanan*, 957 So. 2d at 980; *Restaurant of Hattiesburg*, 84 So. 3d at 42; *Gen. Motors Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992).

Here, the evidence that MSM or MSO flagrantly disregarded corporate formalities consists of testimony of a former officer that she did not recall ever being a corporate officer; she

16

thought she was just an employee. This evidence does not show flagrant disregard.

Mississippi law nevertheless allows for exceptions to the three-part standard where rigidly maintaining the corporate entity would subvert the ends of justice. *See Stanley*, 951 So. 2d at 542 ("Additionally, the findings of the trial court [declining to pierce the corporate veil] only pertain to a certain number of situations which warrant disregarding the corporate entity. Because of the equitable nature of this doctrine, the corporate veil may be pierced in a variety of situations."). Viewing the evidence in the light most favorable to the plaintiffs, as this Court must at this stage, leads to an inference that this case could be so exceptional as to warrant application of the exception.

It is difficult to now dispute that the defendants' company committed forgery and fraud in an unsuccessful effort to harm a former employee. The defendants cashed out before a federal jury could hold their company accountable with a judgment – a substantial amount of which came in the form of a punitive damages award, indicating egregious behavior – and a federal court of appeals could affirm. The defendants then kept at their same business under a different name, which served to avoid the liability presented by the judgment and the appearance of impropriety that dissolving the company would have had.

It may be a close call as to whether the defendants actually have subverted justice. At the summary judgment stage, however, it is more prudent to set close calls for trial than to risk resolving a dispute of fact in one party's favor. *See, e.g.*, *King v. Bd. of Trustees of State Institutions of Higher Learning of Mississippi*, No. 3:11-CV-403-CWR-FKB, 2014 WL 1276477, at *9 (S.D. Miss. Mar. 27, 2014); *Haire v. United States*, 101 F. Supp. 2d 478, 485 (N.D. Miss. 2000).

17

**IV.     Conclusion**

From 2004 to 2012, defendant William Mounger, II, the president of MSM and MSO, issued a number of "cash calls" asking his fellow MSO shareholders to send money to MSO to pay the costs of defending against Lewis's attempt to collect upon the judgment. Docket No. 71-15. Among other curious things[12] he wrote in his memoranda was this statement: "Hopefully, this will get resolved in federal court since the judges are good at adhering to law and facts which are in favor of the company." *Id.* at 10.

Mounger's statement demonstrates respect for the rule of law federal courts attempt to honor every day. And yet Mounger admitted in his deposition that he, his fellow shareholders, and MSM have never made any effort to pay the federal court judgment Lewis obtained over a decade ago. Docket No. 71-18, at 15.[13]

Many questions remain for adjudication at trial. The Court will hear the facts and rule on those questions with fidelity to Mississippi law and federal procedure. But among the questions raised by the parties, the question the Court itself has is this: if the president of MSM and MSO believes federal judges are good about adhering to law and facts, and four federal judges in the Eighth Circuit have affirmed a judgment against MSM, then why has MSM not once attempted to satisfy that judgment in 12 years?

The motion is granted in part and denied in part. The Court will set a call for the parties

---

[12] *See* Docket No. 71-15, at 2 ("Because of the outstanding litigation in Arkansas, MSO, Inc. can not be dissolved at this time. Although there has been no demand for payment of the litigation decision, the liability is still there."). The first sentence is concerning because it suggests that MSO would have dissolved but for the need to avoid Lewis's judgment. The second sentence is concerning because by the time this memo was written in June 2005, the Eighth Circuit had affirmed the judgment against MSM. MSM should have paid without awaiting a demand. On another level, it is not clear why MSO and its shareholders have been concerned about the Arkansas litigation. If they did no business in Arkansas and are not a continuing enterprise of MSM, they would have nothing to fear.

[13] This was surprising since from 1998 to 2002, MSM and MSO earned and immediately distributed millions of dollars to their employees and shareholders. *See, e.g.*, Docket No. 72, at 49. How could it be that neither company

to discuss pretrial conference and trial dates.

       **SO ORDERED**, this the second day of February, 2015.

                                                   s/ Carlton W. Reeves
                                                   UNITED STATES DISTRICT JUDGE

---

had real income or assets by the time Lewis's appeal was affirmed in 2003?